**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AHZAR SAIYED, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-5524 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SWEDISH COVENANT HOSPITAL, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Mikaznaaz Saiyed tragically passed away after giving birth at Swedish Covenant Hospital.  She became unconscious during labor, and the delivery team had to perform an emergency C-section.  Before long, she went into cardiac arrest, and the medical team rushed her to the intensive care unit.  She passed away a few days later from a rare, life-threatening condition that sometimes occurs in pregnant women.

Her husband, Ahzar Saiyed, brought medical negligence claims against three Swedish Covenant entities, plus two members of the medical team.  The United States later joined the case in place of the doctor and the midwife, because they worked for federally funded clinics.

After discovery, the United States and the Swedish Covenant Defendants moved for summary judgment, arguing a lack of causation.  They challenge the admissibility of the expert testimony.

For the following reasons, the motion for summary judgment filed by the United States is denied.  The motion for summary judgment filed by the Swedish Covenant Defendants is granted in part and denied in part.  The motion by the Swedish Covenant Defendants is granted in the

limited sense that those entities cannot be responsible for the actions and omissions of the doctor or the midwife, because a claim against the United States is the exclusive remedy. The motion is otherwise denied.

**Background**

On the morning of May 29, 2019, Mikaznaaz Saiyed arrived at Swedish Covenant Hospital in Chicago for a scheduled induction of labor for childbirth. *See* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 2 (Dckt. No. 193).

Her delivery team included a midwife, a doctor, and a nurse. Certified Nurse Midwife Carly Bendzans was the primary care provider. Dr. Sarah Lambeth, an obstetrician-gynecologist, was on call as a backup provider. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶ 7 (Dckt. No. 189). Tabita Costiuc was the labor and delivery nurse. *See* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 3 (Dckt. No. 193).

The midwife, the doctor, and the nurse worked for different employers. Bendzans and Dr. Lambeth were employees of federally funded clinics. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶¶ 8–9 (Dckt. No. 189). But Costiuc worked for Swedish Covenant Health. *See* Joint Statement, at 4 (Dckt. No. 203). The distinction is important because it dictates who bears responsibility for their actions and omissions.

The hospital admitted Mrs. Saiyed around 11:19 a.m., and before long, she received an exam. *See* Pl.'s Resp. to Swedish Defs.' Statement of Material Facts, at ¶ 7 (Dckt. No. 190). After the exam, Mrs. Saiyed received two drugs to induce and speed up labor. *See* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 8 (Dckt. No. 193).

Mrs. Saiyed received Cytotec (25 mcg) orally, which is given to pregnant mothers "off-label" to induce labor. *Id.* Cytotec works by releasing hormones that stimulate a mother's uterus to contract. *Id.*

Medicines like Cytotec come with something called a package insert. As the name suggests, a package insert is a document that appears inside the packaging of medication. A package insert is a manufacturer-created, FDA-approved summary that covers the approved uses and potential downsides of a drug. A package insert contains warnings about potential side effects.

The package insert for Cytotec expressly addressed the potential downside of using that medication in labor and delivery. It flagged uterine tachysystole as a possible side effect.

The package insert stated that a "major adverse effect of the obstetrical use of Cytotec is uterine tachysystole." *See* Gubernick Report (Dckt. No. 191, at 408 of 630) (quoting the package insert). "Uterine tachysystole" means that the "uterus is contracting too frequently or more than normal." *See* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 9 (Dckt. No. 193).

The package insert also included warnings about the potential consequences of uterine tachysystole. The insert forewarned that uterine tachysystole "may progress to uterine tetany . . . or *amniotic fluid embolism* and lead to adverse fetal heart changes." *See* Gubernick Report (Dckt. No. 191, at 408 of 630) (quoting the package insert) (emphasis added).

Amniotic fluid embolism is "a rare, but life-threatening condition that only occurs in pregnant women." *See* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 19 (Dckt. No. 193). It is an allergic reaction "in the mother caused by a mixing of mother and baby's cells and fluids." *Id.*

In total, Mrs. Saiyed received four doses of Cytotec, with her last dose at 6:36 p.m. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶¶ 10–11 (Dckt. No. 189).

From her admission to the hospital at 11:19 a.m. through about 7:00 or 7:30 p.m., Mrs. Saiyed's induction of labor progressed without issue. *See* Pl.'s Resp. to Swedish Defs.' Statement of Material Facts, at ¶ 7 (Dckt. No. 190).

But then, at 8:20 p.m., things started going terribly wrong. Mrs. Saiyed's cervical membranes suddenly ruptured. *Id*. at ¶ 8. Bendzans gave Mrs. Saiyed a cervical examination at 8:42 p.m., and then ordered Pitocin, a drug that assists with labor. *Id.*; *see also* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶¶ 12–13 (Dckt. No. 189).

Soon after, Mrs. Saiyed began receiving Pitocin at 2 milliunits per minute. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶ 13 (Dckt. No. 189). The parties offer conflicting evidence about when Mrs. Saiyed stopped receiving the Pitocin, but Costiuc stopped its administration by 10:29 p.m. at the latest. *Id*. at ¶ 15.

At 10:50 p.m., Mrs. Saiyed suddenly became "unarousable," and her heart rate dropped to around 40 beats per minute. *Id*. at ¶ 16. After her heart rate dropped, Costiuc called Bendzans to the room. *Id*. at ¶ 17. Bendzans arrived minutes later and called for a rapid response team, known as a "code blue," based on Mrs. Saiyed's unresponsiveness and worrying fetal heart tones. *Id.* at ¶ 18.

Dr. Lambeth soon arrived and called for an emergency C-section. *See* Pl.'s Resp. to Swedish Defs.' Statement of Material Facts, at ¶ 10 (Dckt. No. 190). The baby was born by C-section at 11:11 p.m. *Id.*

Things continued to deteriorate. Mrs. Saiyed suffered a cardiac arrest. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶ 22 (Dckt. No. 189). She went to the

intensive care unit, and then to Northwestern Hospital for additional intensive care. *Id*. at ¶¶ 23–24.

Unfortunately, Mrs. Saiyed passed away a few days later. *Id*. at ¶ 25. The cause of death was listed as "cerebral edema, amniotic fluid embolism (AFE), and complication of pregnancy." *Id.* at ¶ 26.

Her baby suffered a mild to moderate hypoxic brain injury at birth. The infant spent twenty days at Lurie Children's Hospital. *See* Pl.'s Resp. to Swedish Defs.' Statement of Material Facts, at ¶ 11 (Dckt. No. 190).

Azhar Saiyed, the mother's husband, responded by filing a medical malpractice complaint in state court. He brought claims against Bendzans, Dr. Lambeth, and three Swedish Covenant entities. *See* Cplt. (Dckt. No. 1-1).

The United States removed the case, based on the fact that Bendzans and Dr. Lambeth worked for federally funded clinics. *See* Notice of Removal (Dckt. No. 1). The Secretary of Health and Human Services deemed the federally funded clinics that employed Bendzans and Dr. Lambeth as eligible for Federal Tort Claims Act coverage, pursuant to the Federally Supported Health Centers Act, 42 U.S.C. § 233(g)-(n).

The United States became a defendant and substituted itself in place of those two individuals. So Bendzans and Dr. Lambeth are no longer defendants.

Saiyed later filed an amended complaint, bringing a collection of medical malpractice claims against the United States and three Swedish Covenant entities. *See generally* Am. Cplt. (Dckt. No. 22). The complaint brought claims on behalf of the mother and the child.

The case was originally assigned to Judge Dow, who denied the motion to dismiss. *See* 8/4/22 Order (Dckt. No. 40). The case was later reassigned to this Court.

The parties embarked on discovery, which spanned several years. Fact discovery began in 2022, and the parties requested and received several extensions of time. *See* 8/4/22 Order (Dckt. No. 40); 2/22/24 Order (Dckt. No. 125); 4/8/24 Order (Dckt. No. 134). The parties took dozens of depositions.

Expert disclosures soon followed. Saiyed retained an expert, Dr. Martin Gubernick, to explain what went wrong in the delivery room. He issued a 24-page report that summarized how things unfolded in the hospital that day, including the medical care that Mrs. Saiyed received. *See* Gubernick Report (Dckt. No. 191, at 408 of 630).

Along the way, Dr. Gubernick addressed the cause of her injuries. *See* Pl.'s Resp. to United States Def.'s Statement of Material Facts, at ¶ 38 (Dckt. No. 189). Dr. Gubernick opined that the improper use of medications caused Mrs. Saiyed to have uterine tachysystole, meaning excessive contractions. He also opined that the uterine tachysystole likely caused her to suffer an amniotic fluid embolism.

Specifically, Dr. Gubernick opined that Cytotec can lead to uterine tachysystole. *See* Gubernick Report (Dckt. No. 191, at 408 of 630). "It is well recognized that Cytotec can cause tachysystole which may progress to uterine tetany with marked impairment of uteroplacental flow, uterine rupture, or amniotic fluid embolism and lead to adverse heart changes." *Id.* He based that opinion on the package insert. *Id.*

Dr. Gubernick believes that "[h]er uterus was not given sufficient time to relax." *Id.* In his view, the medical team should have intervened sooner and used medication to slow down the contractions, which put too much pressure on the uterus. *Id.* at 409–10 of 630 ("In my experience, the interventions articulated above, either alone or together, more likely than not would have effectively slowed down Mrs. Saiyed's uterine tachysystole, thereby decreasing

6

uterine tone and pressure and avoiding the decompensation, the apparent amniotic fluid embolism, the fetal intolerance to labor, the emergent cesarean section, and all of the sequalae therefrom.").

Dr. Gubernick also opined that the excessive contractions likely caused Mrs. Saiyed to experience amniotic fluid embolism. In his view, it is "more likely than not in this case that this patient's unabated uterine tachysystole and/or excessive contractions caused and/or contributed to her apparent amniotic fluid embolism that occurred at or near the time of her decompensation around 10:50 PM." *See* Gubernick Report (Dckt. No. 191, at 410–11 of 630); *see also* Defs.' Resp. to Pl.'s Statement of Additional Material Facts, at ¶ 21 (Dckt. No. 193) (paraphrasing the report).

After discovery, the United States moved for summary judgment, and so did the Swedish Covenant Defendants.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322.

### Analysis

Defendants moved for summary judgment on the issue of causation. That's an essential element of the claims under state law and, by extension, the FTCA.

The "FTCA's liability rule incorporates state law." *See Martin v. United States*, 605 U.S. 395, 410 (2025). So, a plaintiff in an FTCA suit must show that "the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Id*. (quoting *Carlson v. Green*, 446 U.S. 14, 23 (1980)); *see also Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019) (explaining that the FTCA "applies to torts, as defined by state law").

In Illinois, "[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *See Morisch v. U.S.*, 653 F.3d 522, 531 (7th Cir. 2011) (quoting *Johnson v. Loyola Univ. Med. Ctr*., 893 N.E.2d 303, 310 (Ill. App. Ct. 2008)).

The cause "need not be the only cause, nor the last or nearest cause, of the injury. It is sufficient if it combines with another cause resulting in the injury." *See Stackhouse v. United States*, 2025 WL 3250930, at *14 (S.D. Ill. 2025) (quoting the Illinois Pattern Jury Instructions).

8

As Defendants see things, Saiyed cannot prove what caused the amniotic fluid embolism. They believe that the testimony of Dr. Gubernick is inadmissible under *Daubert*. And without his testimony, Saiyed cannot carry his burden of proof.

This Court will address Dr. Gubernick's qualifications and methodology. The punchline is that the testimony passes muster, so the claims can get to a jury.

## I.      Causation and *Daubert*

The Supreme Court has conscripted trial courts into serving as gatekeepers when it comes to experts. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. An expert can testify only if the proponent demonstrates that:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

The Seventh Circuit has distilled Rule 702 into a few helpful guideposts. District courts must consider "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original). In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (citation omitted).

9

Everyone agrees that Dr. Gubernick's testimony is relevant. It goes to the issue of causation, which is a key issue in the case.

The question is whether Dr. Gubernick is qualified to opine on causation, and whether he followed a reliable methodology.

### A. Qualifications

The Court begins with Dr. Gubernick's qualifications.

The qualifications of an expert witness is the right place to start. After all, the importance of expertise jumps off the page when reading Rule 702. The rule says that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify" at trial. *See* Fed. R. Evid. 702.

A district court must make sure that an expert knows what he or she is talking about. An expert must know something – and then, the expert must say something about whatever it is that they know. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Just about everything is on the table when it comes to the qualifications of the expert. Rule 702 doesn't require any particular source of expertise. How an expert gained knowledge is less important than whether an expert knows something in the first place. A district court must "consider a proposed expert's full range of practical experiences as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

10

Defendants argue that Dr. Gubernick is unqualified to testify about amniotic fluid embolism. *See* Mem. in Supp. of United States Mtn. for Summ. J., at 7–8 (Dckt. No. 175); Mem. in Supp. of Swedish Defs.' Mtn. for Summ. J., at 6 (Dckt. No. 180). They basically identify a bunch of omissions in his CV.

As Defendants point out, Dr. Gubernick has never published any medical literature on amniotic fluid embolism, and has never lectured on the topic. He has not researched that condition in particular. And he has never managed a labor and delivery involving a mother with amniotic fluid embolism.

Maybe so. But that's a fertile ground for cross examination. At trial, it is common for an attorney to march down a list of questions about what an expert hasn't done. Getting an expert to admit that he or she hasn't done X, Y, and Z is one of the ways to build momentum in front of a jury. The goal is to whittle down the expert until the jury starts to wonder why the expert is there in the first place.

An expert doesn't need to have every experience under the sun to take the witness stand. The question is the sufficiency of an expert's qualifications. An expert can have enough knowledge to have something to say, even if the scope of his or her knowledge and experience doesn't cover the waterfront.

An expert doesn't have to know everything. An expert has to know *enough*.

Treating physicians are a perfect example. By and large, doctors can offer expert testimony about medical conditions and treatment, even if they don't specialize in the particular subject of their testimony. Courts "often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." *See Gayton*, 593 F.3d at 616.

11

In *Gayton*, the district court excluded a doctor's expert testimony that a patient's vomiting contributed to a condition that caused her death. *Id.* at 617–18. The district court reasoned that a physician could not testify about how vomiting contributed to a heart-related death, since the physician was not a cardiologist. *Id.* The Seventh Circuit reversed. *Id.* at 618.

The Seventh Circuit explained that the key question is whether an expert is sufficiently qualified "to answer a specific question." *Id*. at 617. There, the effects of vomiting were "not specialized knowledge held only by cardiologists," but were known by physicians generally. *Id*.; *see also Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) (citing *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24–25 (1st Cir. 2003)) (explaining that it would be an abuse of discretion to exclude expert testimony about plaintiff's pregnancy "on the sole basis that his medical specialty was something other than gynecology or obstetrics").

Generalists can have something important to say. Ask every district court judge.

Dr. Gubernick may not specialize in amniotic fluid embolism. Even so, he knows enough about the condition to give reliable testimony to the jury. Amniotic fluid embolism is a condition that occurs in pregnant women, and Dr. Gubernick is "a board-certified obstetrician gynecologist with over forty years of experience in obstetrics and gynecology." *See* Gubernick Report (Dckt. No. 191, at 393 of 630).

Dr. Gubernick attended medical school at Northwestern University, and he did his residency at New York Hospital – Weill Cornell Medical Center in obstetrics and gynecology. *Id.*

Dr. Gubernick has loads of practical experience in delivery rooms. He has given drugs to induce labor, and is familiar with Cytotec and Pitocin, the two drugs at issue in this case. *Id.* He

has performed C-sections, monitored patients, and "overseen massive transfusions of blood products for conditions like amniotic fluid embolism." *Id.* at 393–94 of 630.

Dr. Gubernick has knowledge about amniotic fluid embolism, too. He is "familiar with amniotic fluid embolism including but limited to its pathophysiology, causes, treatments, and outcomes." *Id.* at 394 of 630.

Dr. Gubernick is a physician trained in the area of pregnancy and childbirth. He has extensive experience with related drugs, procedures, and conditions. That experience gives him sufficient qualifications to take the witness stand.

Maybe a medical condition or treatment could be so specialized that only specialists could opine about it. The more specialized the area of knowledge, the narrower the gate to the witness stand.

But that's not this case. Based on his report, Dr. Gubernick intends to explain to the jury what amniotic fluid embolism is, and how it happens. "Amniotic fluid embolism is a condition in which amniotic fluid (likely with fetal hairs, cells, and other material, etc.) enter the mother's blood stream triggering what is akin to an allergic reaction. The amniotic fluid can leak into the mother's blood stream, prompting mom's body to 'reject', or 'fight off' what it senses is an attacker." *Id.* at 410.

Dr. Gubernick also opined on the best way to treat amniotic fluid embolism. *Id.* at 413–414.

Most importantly, Dr. Gubernick also intends to opine that the excessive contractions likely "caused and/or contributed to" Mrs. Saiyed's amniotic fluid embolism. *Id.* Basically, excessive contractions caused the membranes to rupture in the sac containing the amniotic fluid. The ruptured sac led to a mixing of fluids between the mother and the child. *Id.* at 411 ("Mrs.

13

Saiyed's membranes ruptured in the hours before her decompensation – this means the sac containing the amniotic fluid was ruptured, creating a vector by which excessive pressure in the uterus caused a mixing of mother and baby's fluids.").

By the look of things, Dr. Gubernick believes that his opinions aren't far off from the views of Dr. Lambeth, meaning the delivery doctor (and former defendant). The report summarizes admissions that Dr. Lambeth made at deposition. As Dr. Lambeth admitted, excessive uterine activity can lead to insufficient relaxation time, and insufficient relaxation time can cause pressure to build in the uterus. And an increase in pressure can create a risk of amniotic fluid embolus. *Id.* at 399–400 of 630.

Overall, Dr. Gubernick may not be an expert in amniotic fluid embolism *per se*. But he has substantial expertise in the area of pregnancy and childbirth. He has sufficient background and expertise to explain amniotic fluid embolism to the jury.

## B.    Methodology

The next step is to evaluate the methodology. Defendants believe that Dr. Gubernick lacks a basis to opine about what caused Mrs. Saiyed to suffer an amniotic fluid embolism.

At bottom, Dr. Gubernick offered an opinion with two links in the causal change. He opined that Cytotec likely caused Mrs. Saiyed's uterine tachysystole (again, the excessive contractions). And he opined that the uterine tachysystole likely caused her amniotic fluid embolism.

Basically, the medication caused her uterus to go into overdrive, which led to a rupture. And the rupture caused a mixing of the fluid between the mother and the child.

District courts use several yardsticks to measure whether an expert used a reliable methodology. Courts "consider, among other things: '(1) whether the proffered theory can be

14

and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community.'" *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (quoting *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017)).

But "no single factor is either required in the analysis or dispositive . . . ." *Id*. (quoting *Smith*, 215 F.3d at 719). The list is "neither exhaustive nor mandatory." *See Gopalratnam*, 877 F.3d at 780 (internal citations omitted).

Other relevant factors include whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and whether the expert "adequately accounted for obvious alternative explanations." *Id*. (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment). A district court can "apply these factors flexibly" and has "broad discretion." *Id.*

Defendants take issue with both steps in the causal chain. A chain is only as strong as its weakest link. But here, each of the links is strong enough to get to a jury.

The first link is the connection between the medication and the medical condition. Dr. Gubernick opined that it is "well recognized" that Cytotec can lead to uterine tachysystole. "It is well recognized that Cytotec can cause tachysystole which may progress to uterine tetany with marked impairment of uteroplacental flow, uterine rupture, or amniotic fluid embolism and lead to adverse heart changes." *See* Gubernick Report (Dckt. No. 191, at 408 of 630).

Dr. Gubernick had a sufficiently reliable basis for reaching that conclusion. After all, the package insert itself warns physicians that a "major adverse effect of the obstetrical use of Cytotec is uterine tachysystole." *Id*. (quoting the package insert).

15

A package insert doesn't come out of nowhere. A package insert needs to receive the blessing of both the FDA and the drug manufacturer. And that approval comes after rigorous review and testing. Medical professionals kick the tires on anything said in a package insert because it affects how physicians use the medication with patients.

Dr. Gubernick based his opinion on the package insert, and the package insert reflected the understanding of the medical community. The whole point of a package insert is its reliability. It's a go-to source for reliable information about how to use a drug, and what side effects might follow.

A package insert isn't guaranteed to be *right* – but it is a sufficiently reliable basis for offering an opinion about a medication to a jury.

Defendants point out that package inserts sometimes overstate the risks. No drug manufacturer wants to face lawsuits for a failure to warn. So drug manufacturers have an incentive to over-warn, and err on the side of caution.

Fair enough. But once again, that's fodder for cross examination. Maybe a package insert is over-inclusive. But it doesn't have to provide definitive gospel truth for an expert to rely on it.

The second link is the connection between the two medical conditions. Dr. Gubernick opined that the excessive contractions likely caused the amniotic fluid embolism. "It is more likely than not in this case that this patient's unabated uterine tachysystole and/or excessive contractions caused and/or contributed to her apparent amniotic fluid embolism that occurred at or near the time of her decompensation around 10:50 PM." *See* Gubernick Report (Dckt. No. 191, at 410–11 of 630).

16

Once again, Dr. Gubernick relied on the package insert. It says that Cytotec can cause uterine tachysystole, and that uterine tachysystole "may progress to . . . amniotic fluid embolism." *See* Gubernick Report (Dckt. No. 191, at 408 of 630).

More broadly, Dr. Gubernick explained how excessive contractions can put too much pressure on the uterus. A build-up in pressure can cause uterine membranes to rupture, leading to a mixing of the fluids between the mother and the child. *Id.* at 407–11.

Defendants point out that Dr. Gubernick drew a connection, but in their view, that's not enough. They rely on the age-old maxim that correlation is not the same thing as causation. *See* Mem. in Supp. of United States Mtn. for Summ. J., at 11–14 (Dckt. No. 175).

True enough. If Dr. Gubernick had nothing to offer but speculation, he wouldn't get his foot in the door of the courtroom.

But here, Dr. Gubernick relied on the FDA-approved package insert, and he offered an explanation of how excessive contractions can lead to a rupture. That's a sufficiently reliable basis to get in front of a jury. Any problems with his theory are best left for cross examination.

Other courts have recognized the legitimacy of relying on a package insert when it comes to causation. *See, e.g.*, *Cottingham on Behalf of K.C. v. Sec. of Health and Human Services*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (explaining that "medical records paired with the [medication's] package insert constitutes objective evidence supporting causation"); *see also United States v. Wagoner*, 2025 WL 3481802, at *9 (N.D. Ind. 2025) (finding "a rational connection existed here between the data and the opinions" where the expert relied, in part, on a package insert).

Defendants also point out that medical literature demonstrates that amniotic fluid embolism "occurs in the absence of tachysystole." *See* Swedish Defs.' Reply in Supp. Mtn. for

17

Summ. J., at 5 (Dckt. No. 195). And Defendants say that "the current state of medicine does not know what causes amniotic fluid embolism . . . and it unfortunately still does not know how to prevent it." *See* Mem. in Supp. of United States Mtn. for Summ. J., at 1 (Dckt. No. 175).

That argument raises the bar. An expert does not have to foreclose other possibilities when it comes to causation. And a plaintiff doesn't have to prove that negligence is the only explanation. Instead, an expert simply needs to offer an opinion that is sufficiently reliable to put before the jury. And here, Dr. Gubernick did.

District courts stand guard and protect juries from unreliable experts. But once an expert offers a sufficiently reliable opinion, it is up to the adversary process to find the truth. *See Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) ("Especially in a case of dueling experts . . . it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony."); *Wielgus v. Ryobi Techs., Inc.*, 2012 WL 3643682, at *2 (N.D. Ill. 2012) ("[T]he trial court's role as gatekeeper is not intended to replace cross-examination and the presentation of conflicting evidence as traditional mechanisms for highlighting weaknesses in the expert's testimony."); Fed. R. Evid. 702 advisory committee note (2000 Amends.) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

Overall, the Court finds that the opinions of Dr. Gubernick pass muster under *Daubert* and Rule 702. Dr. Gubernick has the qualifications to give his opinions, and the opinions have sufficient indicia of reliability to get to a jury. Beyond that, the jury will have to figure it out.

## II.       Federal Tort Claims Act

The Swedish Covenant Defendants also moved for partial summary judgment on a limited issue. They wanted to make sure that they aren't on the hook for any actions or omissions of Dr. Lambeth and Bendzans (the midwife). The Court agrees.

The Swedish Covenant Defendants point out that the Federal Tort Claims Act is "the exclusive remedy for plaintiffs against an employee of a federally funded entity 'while acting within the scope of his office or employment.'" *See* Mem. in Supp. of Swedish Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 180) (quoting 28 U.S.C. §§ 1346(b), 2679(b)(1)).

Dr. Lambeth and Bendzans worked for federally funded clinics, so they are treated as employees of the United States. As a result, the Swedish Covenant Defendants argue that the United States is the only party who can have responsibility for their actions and omissions.

This Court ordered a few supplemental statements from the parties to pin things down. *See* 10/16/25 Order (Dckt. No. 199); 10/28/25 Order (Dckt. No. 202). In response, Saiyed agreed that a claim against the United States is the exclusive remedy for any negligence by Dr. Lambeth and Bendzans. *See* Pl.'s Combined Mem. in Resp. to Def.'s Mtn. for Summ. J., at 15 (Dckt. No. 187). Saiyed later confirmed that he "is not seeking to hold the Swedish Defendants liable for the acts and omissions of anyone other than Nurse Costiuc." *See* Joint Statement, at 2 (Dckt. No. 203).

In the end, the issue turned out to be a non-issue, because everyone agreed with the right outcome. Everyone agrees that the Swedish Covenant Defendants have no responsibility for the actions and omissions of Bendzans and Dr. Lambeth.

19

**Conclusion**

For the foregoing reasons, the motion for summary judgment filed by the United States is denied. The motion for summary judgment filed by the Swedish Covenant Defendants is granted in part and denied in part. The motion is granted in the limited sense that the Swedish Covenant Defendants have no liability for the actions and omissions of Bendzans and Dr. Lambeth. The motion is otherwise denied.

Date:   March 24, 2026

_____

Steven C. Seeger
United States District Judge

20